James V. AQUAVELLA and Salmon Harvey, partners, doing business as Glen Oaks Nursing Home, and Arista Development Corporation, Plaintiffs-Appellants,

v.

Elliott L. RICHARDSON,[*] Secretary of Health, Education and Welfare, the United States of America, and Aetna Life and Casualty Company, Defendants-Appellees.

No. 188, Docket 34247.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1970.

Decided Jan. 25, 1971.

---

[*] Substituted for the original defendant, Robert Finch, pursuant to FRAP Rule 43(c) (1).

Michael T. Tomaino, Rochester, N. Y. (Nixon, Hargrave, Devans & Doyle, Donald R. Adair, Rochester, N. Y., on the brief), for plaintiff-appellant Aquavella.

Robert M. Feinson, Atty., Dept. of Justice (William D. Ruckelshaus, Asst. Atty. Gen., H. Kenneth Schroeder, Jr., U. S. Atty., W. D. N. Y., Morton Hollander, Atty., Dept. of Justice, on the brief), for appellees.

Before SMITH and FEINBERG, Circuit Judges, and LEVET, District Judge.**

FEINBERG, Circuit Judge:

Plaintiffs Dr. James V. Aquavella and Dr. Salmon Harvey instituted this action after defendant Secretary of Health, Education and Welfare (HEW) suspended payments under the Medicare Act to Glen Oaks Nursing Home, which the doctors operated as a partnership.

** Of the Southern District of New York, sitting by designation.

Plaintiffs claim that the suspension was imposed without statutory authority and in a manner that violated due process. The United States District Court for the Western District of New York, Chief Judge John O. Henderson, dismissed plaintiffs' original and amended complaints for lack of jurisdiction. The former was dismissed on the ground that the Medicare Act, 42 U.S.C. §§ 1395–1395*ll*, precluded judicial review and the latter on the ground that the suspension of payments was not final action under section 10 of the Administrative Procedure Act, 5 U. S.C. §§ 701–706. This appeal is from both orders.[1] For reasons explained below, we reverse and remand for a decision on the merits.

The Glen Oaks Nursing Home, a private 60-bed "extended-care facility" under the Act, furnished post-hospital care for patients who no longer needed intensive hospital care but were not yet well enough to go home. Glen Oaks began operation in April 1967, and was qualified at that time as a "provider of services" under the Medicare Act.[2] To obtain such qualification, Glen Oaks had entered into an appropriate agreement with the Secretary of HEW which incorporated certain provisions of the Act.[3] The most pertinent of these was the promise not to charge patients for services payable by the Government under the Medicare program. A provider of services under the Act is reimbursed not by the patient but by the Secretary or by certain private organizations, under contract to the Secretary, that act as fiscal intermediaries. In the present case, appellee Aetna Life and Casualty Company (Aetna) has served as Glen Oaks's fiscal intermediary since 1968, Approximately 98 per cent of the patients at Glen Oaks qualified to receive Medicare benefits and, therefore, the institution was almost entirely dependent on Medicare payments for its revenues.

Although all of the intricacies of payment to a provider of services under the Medicare Act are not relevant here, some background information is necessary. The Secretary, through the Social Security Administration, determines the "reasonable cost"[4] of services covered by the Act and periodically pays the amount so determined. By statute, reimbursement is to be no less often than monthly but the Secretary may make "necessary adjustments on account of previously made overpayments or underpayments."[5] Where, as here, a fiscal intermediary is nominated by a provider, that intermediary makes the initial determinations of amount and reimburses the provider.[6] In order to protect the financial well being of a provider, the Secretary or a fiscal intermediary will make periodic cash advances, "current financing," as well as reimbursements for costs already incurred.[7] From April 1968 to July 1969, Aetna apparently reviewed and allowed, with few exceptions, the amounts requested by Glen Oaks and made payments approximately every two weeks. In addition, Aetna made an annual review of the Glen Oaks operation and approved additional reimbursement as a "necessary adjustment."

Appellant's difficulties began in the spring of 1969. At that time, the Bureau of Health Insurance of the Social Security Administration conducted a review of audited and unaudited cost reports submitted by providers in order to verify the accuracy of payments made under the Medicare program. By affidavit of Thomas G. Bell, Deputy Director of the Bureau, it is alleged that the

---

1. The two notices of appeal were filed on behalf of plaintiffs. We note, however, that the brief in this court is apparently filed only on behalf of appellant Aquavella. We will, therefore, refer to appellant rather than to appellants.

2. 42 U.S.C. § 1395x(u) (1969).

3. 42 U.S.C. § 1395cc (1969).

4. 42 U.S.C. §§ 1395f(b), 1395x(v) (1969); 20 C.F.R. §§ 405.401–405.488 (1970).

5. 42 U.S.C. § 1395g (1969).

6. 42 U.S.C. § 1395u (1969).

7. See 20 C.F.R. § 405.402 (1970).

review identified Glen Oaks as one of several extended care facilities that had claimed and had been paid for unusually large amounts of ancillary services. The Bureau and Aetna thereafter scheduled an on-site review of the Glen Oaks program and billing procedures. The review team, a registered nurse, a government accountant, and an employee of Aetna, surveyed Glen Oaks in April 1969. The Secretary alleges that this survey uncovered certain irregularities at Glen Oaks. The alleged abuses can be summarized as follows: (1) billing for services not covered by the Act; (2) overutilization of occupational and physical therapy; and (3) increasing the semi-private routine service charge from $32.50 per day to $52.00 per day within one year without submitting adequate cost justification. In light of these conclusions and because Aetna, as of July 14, 1969, had extended $96,000 in current financing to Glen Oaks,[8] the Secretary instructed Aetna to stop making payments to Glen Oaks. The suspension was to continue until an audit of the Glen Oaks operations was completed in order to determine either whether the payments were proper or the amount of overpayments. Appellant contends that payments were suspended without any prior notice or reasonable opportunity to be heard before or after the suspension and that this was improper.

In July 1969, plaintiffs instituted the present action to enjoin defendants from withholding reimbursement and to obtain other relief. By opinion dated July 30, 1969, the district court dismissed the complaint. 306 F.Supp. 860, 862–863. Plaintiffs soon thereafter ceased doing business as an extended care facility because of alleged weekly costs of $25,000, and the alleged impossibility of converting to a "private" institution "overnight." In October 1969, the district court allowed plaintiffs to amend their complaint and to reargue defendants' motion to dismiss, but again dismissed the action.[9] *Id.* at 863–864.

It is helpful at the outset to state the exact issue before us. It is whether a district court has jurisdiction to review the Secretary's decision, alleged to be without statutory authority and in violation of the Constitution, to suspend payments to a provider of services under the Medicare Act. What is not at issue is whether Glen Oaks was overpaid or what was the amount of such overpayment or even the scope of the district court's jurisdiction to review such issues. Because all parties apparently agree that the Medicare Act by its terms does not provide for judicial review in this case, our attention is directed to whether the Administrative Procedure Act (APA) does.[10]

### I.

Under section 10 of the APA, the initial question is whether the Medicare Act "preclude[s] judicial review" in these circumstances. In making this inquiry, we are aware that "[t]he question [should be] phrased in terms of 'prohibition' rather than 'authorization' because * * * judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d

---

**8.** There is a debate as to whether current financing exceeded the amount of billings from Glen Oaks. It is unnecessary for us to resolve this dispute.

**9.** The amended complaint, *inter alia*, included specific allegations as to lack of due process. It also included 28 U.S.C. § 1361 as a jurisdictional basis. In any event, jurisdiction here is proper under 28 U.S.C. § 1331.

**10.** We need not decide in this case whether the APA is an independent grant of jurisdiction. See note 9 *supra*. See also Toilet Goods Ass'n v. Gardner, 360 F.2d 677, 679 n. 1 (2d Cir.), aff'd, 387 U.S. 158, 167, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Byse & Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv. L.Rev. 308, 326–31 (1967).

681 (1967). It is with this presumption of reviewability in mind that we examine the Secretary's argument that suspension of payments is not judicially reviewable.

The Medicare Act expressly provides procedures for judicial review in two types of determinations relevant to a provider of services: that an institution is not qualified to be a provider and that a provider of services agreement should be terminated.[11] Moreover, the Medicare Act [12] incorporates the review provisions of the Social Security Act, which state in part that:

> The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who are parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. * * *

42 U.S.C. § 405(h) (1969).

From these provisions, appellees fashion two arguments. The first is that section 405(h) operates here as an express preclusion of judicial review. The logic is that because no decisions of the Secretary can be reviewed except as provided in the Medicare Act and because the Act does not provide for review of a suspension of payments, the district court did not have jurisdiction. The second argument is that the Act impliedly precludes review. Appellees claim that because Congress carefully selected the types of Medicare determinations involving extended care facilities to be reviewed, Congress intended to have no other determinations reviewed. In light of the standard expressed by the Supreme Court in *Abbott Laboratories*, however, we do not agree.

We have previously considered the effect of section 405(h) on judicial review. In Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966), the threshold question was whether there was jurisdiction to review a decision of the Secretary not to reopen what had become a final and binding disallowance of a claim for benefits under the Social Se-

---

11. 42 U.S.C. § 1395ff(c) provides:

Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services. or with any determination described in section 1395cc(b) (2) of this title, shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

Section 1395cc(b)(2), referred to above, provides:

(b) An agreement with the Secretary under this section may be terminated—
* * * * *
(2) by the Secretary at such time and upon such reasonable notice to the provider of services and the public as may be specified in regulations, but only after the Secretary has determined (A) that such provider of services is not complying substantially with the provisions of such agreement, or with the provisions of this subchapter and regulations thereunder, or (B) that such provider of services no longer substantially meets the applicable provisions of section 1395x of this title, or (C) that such provider of services has failed to provide such information as the Secretary finds necessary to determine whether payments are or were due under this subchapter and the amounts thereof, or has refused to permit such examination of its fiscal and other records by or on behalf of the Secretary as may be necessary to verify such information.

Section 405(g), referred to above in § 1395ff(c), provides in part:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States. * * * The findings of the Secretary as to any fact, if supported by substantial evidence. shall be conclusive * * *.

12. 42 U.S.C. § 1395ii (1969).

curity Act. In answer to the argument that section 405(h) precluded review, we said that:

> the more reasonable construction is that [§ 405(h)] simply forbids attempts to review final decisions on the merits by any route other than that provided in § 405(g) [the judicial review provision of the Social Security Act, quoted in note 11 *supra*].

356 F.2d at 5. Judge Friendly went on to hold that the court did have jurisdiction even though the Secretary's refusal to reopen did not come within the purview of the Social Security Act's review provision. In other words, the second sentence of section 405(h) did not "preclude judicial review" in that case under the APA.

■■ While the Secretary's decision in this case was made under the Medicare Act rather than under the Social Security Act, we believe that the interpretation of section 405(h) in *Cappadora* applies here as well. Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not review that decision by any other means. However, where the Act does not provide such procedures, section 405(h) does not preclude review. In support of their position, appellees cite

to us from the legislative history of the review provisions of the Medicare Act, see note 11 *supra*. The portion of the Senate Report to which appellees refer is reproduced in the margin.[13] The emphasized part indicates only what we have just said; the rest makes clear that individuals may obtain a hearing and judicial review if dissatisfied as to the amount of benefits paid to them only if the amount of controversy is $1,000 or more. However, what is involved here is the Secretary's right to suspend payments to providers and the procedures to be used, not a determination on the merits as to how much a provider— much less an individual beneficiary—is owed or owes. In short, appellees' argument ignores that where agency action is challenged as a denial of due process, it is "immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect." Gonzalez v. Freeman, 118 U.S. App.D.C. 180, 334 F.2d 570, 575 (1964) (Burger, J.). Neither the quoted legislative history nor any we can find manifests such congressional intent by "clear and convincing evidence."[14] Where, as here, the review procedures of the Medicare Act do not apply, they do not limit "nonstatutory" review.[15] We conclude,

13. The committee's bill provides for the Secretary to make determinations, under both the hospital insurance plan and the supplementary plan, as to whether individuals are entitled to hospital insurance benefits or supplementary medical insurance benefits and for hearings by the Secretary and judicial review where an individual is dissatisfied with the Secretary's determination. Hearings and judicial review are also provided for where an individual is dissatisfied with a determination as to the amount of benefits under the hospital insurance plan if the amount in controversy is $1,000 or more. (Under the supplementary plan, carriers, not the Secretary, would review beneficiary complaints regarding the amount of benefits, and the bill does not provide for judicial review of a determination concerning the amount of benefits under part B where claims will probably be for substantially smaller amounts than under part A.) *Hos-*

*pitals, extended care facilities, and home health agencies would be entitled to hearing and judicial review if they are dissatisfied with the Secretary's determination regarding their eligibility to participate in the program. It is intended that the remedies provided by these review procedures shall be exclusive.* [Emphasis supplied by appellees.] S.Rep.No.404, 89th Cong., 1st Sess. 54–55 (1965). U.S.Code Cong. & Admin. News, p. 1995.

14. Abbott Laboratories v. Gardner, 387 U. S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), quoting from Rusk v. Cort, 369 U.S. 367, 380, 82 S.Ct. 787, 7 L.Ed. 2d 809 (1962), and citing L. Jaffe, Judicial Control of Administrative Action 336–59 (1965).

15. Cf. Nor-Am Agricultural Prods., Inc. v. Hardin, Dkt. No. 18478, 435 F.2d 1133 (7th Cir., Nov. 9, 1970) (*en banc*), in which the Seventh Circuit held that a dis-

therefore, that it was error to dismiss the original complaint on the ground that the Medicare Act expressly or impliedly precluded the suit here.

■ Two further observations are appropriate before we leave this point. Although quoting section 10(a) (2) of the APA, 5 U.S.C. § 701(a) (2), in their brief, appellees do not appear to argue that review under section 10 of the APA is barred because the Medicare Act "so far" commits the agency action (suspension of payments) "to agency discretion" that the suspension could not be reviewed even if there were a clear abuse as to authority or procedure. In any event, if appellees are so arguing, we do not accept that construction here. See *Cappadora, supra,* 356 F.2d at 5–7.

Finally, appellant urges us to characterize the Secretary's action as a termination of a provider agreement rather than a suspension of payments. So characterized, it would have been contrary to the statutory requirements of notice and hearing, 42 U.S.C. § 1395ff(c), 20 C.F.R. §§ 405.614, 405.-1501, et seq. (1970), and the district court would have had jurisdiction to order the Secretary to act in accordance with that provision of the statute. Since we ultimately hold that the district court did have jurisdiction here, that argument should be considered and resolved by that court in the first instance.

## II.

Our inquiry does not stop here, however. As stated above, the district court also dismissed the amended complaint on the ground that the suspension was not "final agency action" under the APA.[16] Courts have employed the elusive concept of finality, as well as the related and often overlapping doctrines of ripeness and exhaustion of administrative remedies, to determine whether or when they should inject themselves into the administrative process. While each doctrine has its own nuances, common to all is a careful balancing of the need for effective judicial protection against the need for efficient and responsible administrative action. The result of such balancing will obviously vary in different factual situations, but there are guidelines and principles that assist us in the task. In applying a ripeness test in *Abbott Laboratories,* the Supreme Court articulated factors relevant to the final agency action question. The Court considered "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration,"[17] and examined such factors as whether the issue to be reviewed was more "legal" than "factual,"

trict court did not have jurisdiction to review the emergency suspension of products registered as "economic poisons" under § 4(a) of the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 135b(a). Plaintiffs-appellees in that case manufactured and distributed several mercury compounds that were used as fungicides for the treatment of planting seeds and were registered under § 4(a) of the Act. The Secretary of Agriculture suspended registration of the compounds after three children were tragically injured by eating pork from hogs fed with treated seeds. Although superficially similar to the case we decide today, *Nor-Am* differs in essential ways. Congress has given the Secretary of Agriculture specific emergency powers to suspend registration in the face of "an imminent hazard to the public," 7 U.S.C. § 135b(c). Congress also limited this emergency pow-

ed by providing the procedural safeguards of prompt notice and expedited administrative and judicial review. 7 U.S.C. §§ 135b(c), (d). Indeed, plaintiffs there had requested an expedited administrative hearing, but filed suit before that hearing was concluded. Moreover, the subject matter regulated in *Nor-Am* directly affects the public health and safety rather than merely the public purse.

16. 5 U.S.C. § 704 (1969).

17. Abbott Laboratories v. Gardner, 387 U. S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ; see also Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) ; Gardner v. Toilet Goods Ass'n, 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967) ; The Supreme Court, 1966 Term, 81 Harv.L. Rev. 69, 225–31 (1967).

whether the action had an immediate and substantial impact upon the complaining party, and whether review would delay or impede effective enforcement of the relevant administrative scheme. Evaluating these factors in the context of the present case, we conclude that the suspension of payments was final agency action.

The resolution of the issue as framed in the complaint would not be aided by any further administrative elaboration of the facts. The complaint challenges the statutory authority of the Secretary to suspend payments and alleges that the procedure denied plaintiffs due process. Without indicating any opinion as to the merits, we note that these issues have traditionally been considered "legal" questions which the courts are particularly well suited to examine. No particular agency expertise is required to resolve whether the Secretary may suspend payments, whether he must give prior notice, or whether he must hold pre- or post-suspension hearings. Although we recognize that agency experience may be relevant to deciding these issues, that experience can be communicated to the court as part of the record, in argument or in a brief.

Moreover, the undisputed facts of this case clearly show immediate and substantial impact upon the complaining party. Glen Oaks was quickly forced out of business after substantially all of its revenues were suspended. Under the "pragmatic" approach developed in the case law, such harm alone is often sufficient reason to find final agency action.[18] In addition, there are no procedures, either in the Medicare Act or in its regulations, by which appellant can secure administrative review of the suspension. Cf. Nor-Am Agricultural Products, Inc. v. Hardin, Dkt. No. 18478, 435 F.2d 1133 (7th Cir., Nov. 9, 1970),

discussed in note 15 *supra*. Without judicial intervention at this stage, appellant is at the mercy of the Secretary who can insulate the allegedly illegal suspension from review by refusing to take any further action. To deny jurisdiction in this case is to hold the suspension unreviewable, perhaps forever.

Nor will judicial intervention disrupt the efficient enforcement of the Medicare Act or its administrative scheme. Appellees contend that the Secretary's determination that an audit would be necessary contemplated further agency action. However, judicial scrutiny of the Secretary's authority to suspend should have little, if any, effect on his ability to determine administratively whether there has been any overpayment to plaintiffs. Indeed, part of plaintiffs' requested relief can be interpreted as an attempt to secure administrative proceedings in order to insure such determination. In any event, the slight disruption of administrative routine that may result from finding jurisdiction in this case is clearly outweighed by the immediate injury to plaintiffs.

 For some purposes, the suspension of payments could be considered a preliminary administrative action. It might be a prelude to a formal termination of the provider agreement or a protective move in determining whether there have been unauthorized payments. In either case, we doubt that any court would interfere at that stage if there were regulations providing for a reasonably prompt administrative review of the preliminary action. Cf. *Nor-Am, supra*. But suspension here occurred over 18 months ago, and the record shows no further formal action by the Secretary, although we are informed that the audit has been completed. Whether an agency action is final for purposes of the APA should not depend on semantic

18. Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Trans Pacific Freight Conference of Japan v. Federal Maritime Board, 112 U.S.App.D.C. 290, 302 F.2d 875 (1962); Isbrandtsen Co. v. United States, 93 U.S.App.D.C. 293, 211 F.2d 51, cert. denied sub nom. Japan-Atlantic & Gulf Conference v. United States, 347 U.S. 990, 74 S.Ct. 852, 98 L.Ed. 1124 (1954).

characterizations but rather on a careful evaluation of the separate but coordinate functions of courts and administrative agencies and of the impact of the challenged action on the parties. In light of these considerations, we conclude that the suspension of payments to plaintiffs under the Medicare Act with no formal action thereafter for many months is a reviewable final agency action and that the district court's dismissal of the amended complaint was error. We express no opinion on whether the Secretary had the right to suspend or whether the procedure utilized did violate due process.

Accordingly, we reverse both orders and remand for consideration of these issues on the merits.